IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

VICKIE MILLER,

    Plaintiff,

v.                                                                                                                 No. 05-2413 B

NIPPON CARBON COMPANY, LTD.,
MITSUBISHI LOGISTICS CORPORATION,
MITSUBISHI LOGISTICS AMERICA
CORPORATION, MOROHOSHI FREIGHTAGE,
LTD., and YANG MING MARINE TRANSPORT
CORPORATION,

    Defendants.

And

YANG MING MARINE TRANSPORT
CORPORATION,

    Third-Party Plaintiff,

v.

INTERMODAL CARTAGE COMPANY, INC.,

    Third-Party Defendant.

_____

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT
MITSUBISHI LOGISTICS AMERICA CORPORATION
_____

       This diversity action for wrongful death arose when Larry Miller, the husband of the Plaintiff, Vickie Miller ("Miller"), was killed after an electrode fell on him as he attempted to offload it from a shipping container. Before the Court is the motion for summary judgment of the

1

Defendant, Mitsubishi Logistics America Corporation ("MLAC"). The plaintiff has responded, and this motion is now appropriate for disposition. For the reasons set forth below, the motion for summary judgment is GRANTED.

## BACKGROUND

The following facts are undisputed unless noted. On June 10, 2004, Larry Miller was killed while unloading "several 4800 pound electrodes from an intermodal cargo container." (Def.'s Statement of Material Facts in Supp. Mot. Summ. J. ¶ 1) ("Def.'s Facts"). Defendant Nippon Carbon Company, Ltd. ("Nippon") manufactured the electrodes at its plant in Japan and had them shipped to Nucor Steel in Blytheville, Arkansas. (Def.'s Facts ¶ 2). Defendant Morohoshi Freightage, Ltd. ("Morohoshi") loaded the electrodes into cargo containers and delivered the containers to a "container yard in Nagoya, Japan." (Def.'s Facts ¶¶ 2-3). Defendant/Third-Party Plaintiff Yang Ming Marine Transport Corporation ("Yang Ming") "transported the cargo containers by ocean freighter to Long Beach, California then by rail to Memphis, Tennessee." (Def.'s Facts ¶ 3). MLAC arranged for transportation of the containers from the railyard in Memphis to their ultimate destination in Arkansas.[1] (Def.'s Facts ¶¶ 4-6). MLAC had no contractual obligation "with

---

[1] In her response, the Plaintiff contends that MLAC's responsibility was broader than simply arranging for the transportation of the containers from Memphis to Arkansas and claims that, in fact, MLAC bore some level of responsibility for the shipment beginning in Japan. The Plaintiff offers the following deposition testimony of Robert Wallace, a deputy general manager for MLAC, in support of her claim:

> Q. Was it Mitsubishi Logistics America's responsibilities under this through bill of lading [ML 0004] to arrange for transportation from the point of origin which is shown on here as Nagoya, Japan to the point of destination which is shown as Blytheville, Arkansas?
> A. Yes. Under our bill of lading, that would cover Nagoya CY. It's been issued under Mitsubishi Logistics America

2

respect to loading the electrodes into the cargo containers or inspecting or insuring proper stowage of the electrodes within those containers."[2] (Def.'s Facts ¶ 7). This defendant did, however, receive a copy of Nippon's shipping plan for the electrodes which it forwarded to Miller's employer, Global Material Services ("GMS"). (Pl.'s Statement of Undisputed Facts in Opp. to Def.'s Mot. Summ. J. ¶ 1) ("Pl.'s Facts"). According to the Plaintiff's expert, the Nippon shipping plan did not comport with industry standards for the transportation of "[m]achinery and other heavy items." (Pl.'s Facts ¶ 5) (quoting Marshall White[3] Aff. ¶ 3, ex. 3).

## STANDARD OF REVIEW

Rule 56( c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct.

---

> Corporation bill of lading. So this transport document would cover that portion.

(Pl.'s Resp. to Def.'s Facts ¶ 4 (citing Robert Wallace Dep. at 16)) ("Pl.'s Resp.").

[2]The Plaintiff admits that the Defendant had no contractual duty in this regard; however, she again points this Court to the deposition testimony of Wallace who said that if MLAC knew of an improperly loaded cargo container, it would have "an obligation to let the proper people know . . . so they can take corrective action." (Pl.'s Resp. ¶ 7).

[3]Marshall White provided an affidavit as an expert in international shipping standards. (Marshall White Aff. ¶ 1).

1348, 1356 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2552. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552. In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## ANALYSIS

MLAC contends that it had no responsibility to warn the decedent through his employer that the electrodes in question were improperly packaged or that the shipping plan failed to comport to industry standards. The Plaintiff responds that MLAC owed her husband a duty to "object to a facially deficient shipping plan." (Pl.'s Resp. at 11). The Defendant replies that its sole obligation in this matter was to act "as a 'travel agent' for shippers' cargo." (Def.'s Reply at 5). MLAC argues that because it is not in the cargo unloading business, it had no knowledge that Nippon's

4

shipping plan was improper.

In order to prevail at trial, Miller must show "(1) a duty of care owed by the defendant to [her decedent], (2) conduct by the defendant breaching that duty, (3) an injury or loss to [her decedent], (4) causation in fact, and (5) proximate or legal cause." Waste Mgmt., Inc. of Tenn. v. S. Cent. Bell Tel. Co., 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997) (citing McClenahan v. Cooley, 806 S.W.2d 767, 774 (Tenn. 1991)).

"The existence or nonexistence of a duty owed to the plaintiff by the defendant is a question of law to be determined by the court." Burroughs v. Magee, 118 S.W.3d 323, 327 (Tenn. 2003). Therefore, this Court must determine

> whether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others-or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court. A decision by the court that, upon any version of the facts, there is no duty, must necessarily result in judgment for the defendant.

Lindsey v. Miami Dev. Corp., 689 S.W.2d 856, 858-59 (Tenn. 1985) (quoting Prosser and Keeton, Torts, § 37, p. 236 (5th ed. 1984)).

In support of their respective positions, the parties have presented to the Court various excerpts from the deposition testimony of Robert Wallace, a manager for MLAC. See supra at 2 n.1. The relevant cited portions of Wallace's testimony are as follows:

> Q: Did you at that time provide [GMS] with a drawing showing the packaging of the material which would be [the electrodes]?
> [Wallace]: I provided [them] in my fax a copy of a schematic, a drawing of how the product may be loaded into the

5

|           | container. |
|-----------|------------|
| Q:        | How it may be loaded into the container? |
| [Wallace]: | Correct. We don't know exactly, you know, what is loaded. We're going by the information that was, you know, provided. |
| Q:        | All right. Who provided this information [to MLAC]? |
| [Wallace]: | This particular document was received by our office in Japan, Mitsubishi Logistics Corporation [from Nippon]. |
| . . . . | |
| Q:        | And then, [once again] you . . . furnished this plan to [GMS] for [its] use in planning how to unload and then transload this shipment to a truck? |
| [Wallace]: | No, sir. This document was provided for his information so that he could review to see if he had the capability to unload cargo loaded in such a manner. |
| . . . . | |
| Q:        | Based on your experience in material handling, did you consider [the proposed loading plan from Nippon] a proper was to load electrodes? |
| . . . . | |
| [Wallace]: | I, in my career, have never seen electrodes loaded and have no experience in the loading or unloading of electrodes, that particular product. Based on the information that we received, the weights, the dimensions, the schematic, my unqualified experience, it looks acceptable. |
| . . . . | |
| Q:        | In you capacity as deputy general manager of [MLAC], are you familiar with industry standards for shipping material of this kind? |
| [Wallace]: | <u>There are, to my knowledge, in 20 years of experience, no industry standards for shipping this product</u>. |
| . . . . | |
| Q:        | . . . 'Machinery and other heavy items should be crated or boxed, but provided with skids to permit proper handling and stowage.' Do you agree with that [statement]? |
| [Wallace]: | Yes. |
| . . . . | |
| Q:        | Was it apparent to you . . . from looking at the |

6

|  |  |
|---|---|
|  | diagram that they sent you that these were neither crated nor boxed? |
| [Wallace]: | They're definitely not crated or boxed. |
| . . . . | |
| Q: | Does a logistics company . . . need to be aware of those various stresses that are involved in intermodal freight? |
| [Wallace]: | Yes. We're aware of the stresses, but we're not loading the cargo, so we don't really have to consider so much the movement of the cargo inside the unit. |
| Q: | What do you consider your duty to be if you know or have reason to know that cargo is improperly loaded in your position as a logistics company? |
| [Wallace]: | Unfortunately, we don't know if it's improperly loaded. The shipper or their contracted agent loads the container. We're moving the container as a unit, so we don't know if it's improperly loaded. |
| . . . . | |
| Q: | Is your company, in your opinion, qualified to handle intermodal shipping if it has nobody in the company who can detect an unsafe condition. |
| [Wallace]: | We're not in the business to unload or handle cargo. We handle the documentation and facilitate the clearances. We don't touch the cargo, so we wouldn't have a need to have someone qualified to inspect cargo. |

(Wallace Dep. at 21, 22, 23, 27, 28, 29, 72) (emphasis added).

The Defendant also cites the decision in Galjour v. General American Tank Car Corp., 1991 WL 121193 (E.D. La. June 24, 1991), in support of its contention that it did not owe GMS a duty to warn it that the electrodes were being shipped improperly. In Galjour, the plaintiffs sued for damages arising "from a railroad tank car fire." 1991 WL 121193, at *1. The uncontested facts showed that the fire started when the "tank car's cargo of liquid butadiene leaked and exploded. Polysar [was] the owner of the butadiene. Polysar hired Mitsui & Co. (U.S.A.), Inc. via telex to receive the butadiene . . . and deliver it via tank car to Polysar's plant in Chattanooga, Tennessee. Polysar had no function in preparing the butadiene for transportation beyond hiring Mitsui to

7

receive, load, and ship the butadiene." Id.  In considering whether Polysar owed a duty of care to the plaintiffs, the district court stated that

> [t]he bill of lading, which was prepared by Mitsui, listed Mitsui as the shipper of the butadiene and Polysar as the consignee. The only evidence offered to show that Polysar was the shipper is the testimony of Polysar's representative, David Darnell, who testified before the National Transportation Safety Board that Polysar was "in fact the shipper that hired Mitsui as a contractor to ship the material for us." While this testimony might show that Polysar was the technical "shipper" of the butadiene, it confirms the fact that Polysar played no functional role in shipping the butadiene. Under these circumstances, Polysar owed no duty to inspect the tank car. Whether Polysar was the technical shipper of the butadiene is not a genuine issue because regardless of Polysar's technical status, the substantial evidence is that Polysar acted reasonably in not conducting an inspection, and relying on its contractor, Mitsui, to ensure the safe loading and transportation of the butadiene.  Reasonable men cannot differ.

Id. at *2 (footnote omitted) (emphasis added); see also Monroe v. Bardin, 249 A.D.2d 650, 671 N.Y.S.2d 191 (N.Y. App. Div. 1998) (holding that general contractor owed no duty to subcontractor's employee on a log home construction project for the negligent acts of a third-party trucking company occurring during the unloading of logs to be used in construction based on the general contractor's lack of control over the unloading process).

The Court finds the reasoning in Galjour persuasive and concludes MLAC did not owe a duty to inform GMS that the electrodes were not being shipped properly.  In the present case, MLAC did not load or unload cargo; it simply hired those who do.  To the extent MLAC possessed information concerning the cargo, it submitted that information to GMS, a company that was engaged in the loading and unloading of cargo.  Indeed, MLAC's stated purpose in submitting the schematics to GMS was for GMS to ascertain whether it had the functional capacity to unload the electrodes from the cargo container.  Further, although the Plaintiff presents the affidavit of a

8

reported transportation shipping expert, Miller has failed to show that MLAC either was or should have been aware that the configuration of the electrodes within the cargo container fell below an accepted standard of care in the industry.  In this regard, the Court again notes MLAC was not engaged in the loading and unloading of cargo containers.  Rather, Morohoshi handled the loading of the electrodes into the cargo container under the direction of Nippon.

Based on these facts, the Court concludes the Plaintiff has failed to establish that in the role MLAC served in the transportation of this cargo, it either knew or should have known the Nippon transportation plan was "facially deficient."  See Limbaugh v. Coffee Med. Ctr., 59 S.W.3d 73, 86 (Tenn. 2001) (stating that a duty arises only when the defendant knew or should have known that "an unreasonable risk of harm to a foreseeable, readily identifiable third person" existed) (quoting Turner v. Jordan, 957 S.W.2d 815, 821 (Tenn. 1997)).  Accordingly, the Defendant's motion for summary judgment is GRANTED.

**IT IS SO ORDERED** this 30th day of March, 2007.

                                          s/  J. DANIEL BREEN
                                          UNITED STATES DISTRICT JUDGE